**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>87.98 ACRES OF LAND MORE OR )<br>LESS IN THE COUNTY OF )<br>MERCED; DONN RAYMOND )<br>CAMPION, et al., )<br><br>Defendants. )<br>_____ ) | NO. Civ. F. 03-6064 AWI LJO<br><br>**ORDER RE: MOTION FOR PARTIAL SUMMARY ADJUDICATION, OR IN THE ALTERNATIVE, MOTION IN LIMINE TO EXCLUDE EVIDENCE OF RESIDENTIAL SUBDIVISION AS HIGHEST AND BEST USE; MOTIONS IN LIMINE TO (1) EXCLUDE TESTIMONY OF ARTHUR GIMMY, (2) EXCLUDE TESTIMONY OF RICHARD WATSON, AND (3) EXCLUDE EVIDENCE OF DEFENDANT'S DEVELOPMENT PLAN** |

This matter is before the court on Plaintiff's motion for partial summary adjudication and several motions in limine to exclude Defense witnesses and evidence. All motions are opposed. A related motion in limine to exclude evidence of the health effects of electromagnetic fields and to exclude the testimony of Cindy Sage is addressed in a separate order. Oral argument on these motions were held on October 11, 2005 and October 17, 2005.

**I. History**

Plaintiff United States of America ("Government"), through eminent domain, took an easement over Defendant Donn Raymond Campion's land in order to construct a high-voltage 500kV electrical transmission line ("Path 15"). On August 7, 2003 The Government filed a declaration of taking over 74.59 acres for the transmission line itself and 13.09 acres for access

1

1   (200 feet wide), totaling 87.98 acres.  The transmission line has already been built and is in

2   operation.

3           The property subject to the taking is a 3,220.52 acre plot named Agua Fria.  It is located

4   in western Merced County and is currently used for grazing livestock.  Agua Fria is zoned A-2 ,

5   exclusive agricultural use with human habitation limited to one dwelling per 160 acres.  It is

6   located southwest of the intersection of Interstate 5 and State Highway 152, south of the

7   intersection of State Highway 152 and State Highway 33.  The northern boundary of Agua Fria is

8   one mile away from State Highway 152 and State Highway 33; the eastern boundary is

9   approximately two miles from Interstate 5.  The Jasper Sears Road provides access to a frontage

10  road that leads to the State Highway 152.  The Billy Wright Road leads east from Agua Fria

11  towards Interstate 5, but actual access to that highway is unclear.  Agua Fria is set in the foothills

12  of the Coastal range.  Interstate 5 runs along the Central Valley floor.  Agua Fria contains two

13  valleys that run north-south.  The eastern valley is smaller and the western valley is larger.  Path

14  15 runs north-south through the larger western valley.  In addition to Path 15, there are two pre-

15  existing 500kV electrical transmission line that also run north-south through Agua Fria in the

16  smaller eastern valley.  Agua Fria is subdivided into two parts; Campion bought northern Wild

17  Wind Ranch first and then southern Machado Ranch several years later.

18          Campion has, for a long time, sought to develop a portion of Agua Fria (mostly located

19  on Machado Ranch) into a residential subdivision.  His ideal would be to develop single family

20  homes, an 18 hole golf course, community/village center, and other public facilities.  Under U.S.

21  Fish & Wildlife Service rules, developers must leave three acres of open space for every acre of

22  developed land in the area.  Given Agua Fria's overall size, the regulation would limit

23  development to 805 acres.

24          Campion's attempt to develop Agua Fria has been linked with the neighboring Villages of

25  Laguna San Luis project ("Villages").  In 1989, four land owners formed a consortium ("Villages

26  Consortium") to develop residential housing an area near the intersection of Interstate 5 and State

27  Highway 152.  In April 1991, a preliminary Environmental Impact Report (EIR) was filed with

28  Merced County.  Merced County undertook an initial study.  The Consortium filed a Guidance

Package with Merced County in May 1991. Merced County directed the Consortium to plan their properties as a unified town project, the Villages. Doc. 97, Campion Declaration, at 3:19-23. In 1992, the draft EIR was presented to Merced County and reviewed in public meetings. The EIR was revised in 1993, and again presented to Merced County and reviewed in public meetings. In April 1994, Merced County formally published the Villages Community Specific Plan (CSP) for public comment. In addition, a Specific Urban Development Plan (SUDP) was created in 1990. Campion describes the SUDP as "the County planning method for defining the boundaries of the initial study to determine the scope of environmental review." Doc. 97, Campion Declaration, at 4:27-5:1. The Villages consists of 6,214 acres, of which 4,259 acres is set for residential, commercial, and light industrial use. Doc. 85, Villages Initial Study. Currently, the area is primarily zoned for agricultural use. Campion joined the Consortium in the summer of 1991 and included Wild Wind Ranch into the Villages project. Wild Wind Ranch is within the Villages SUDP. Campion purchased the Machado Ranch in July 1993, and it is outside the Villages SUDP.

Campion originally focused development efforts on the Wild Wind Ranch portion of Agua Fria. Campion claims that due to "physical and natural constraints" consisting of existing transmission lines, slope gradients exceeding 30%, noise from State Highway 152, and other problems, he shifted his development efforts south to Machado Ranch. Doc. 97, Campion Declaration, at 6:22-7:1 and 8:12-15. Campion attempted to have Machado Ranch annexed into the Villages SUDP. However, William Nicholson, the Assistant Planning Director of Merced County's Planning Department, wrote Campion in 1995, suggesting that the Villages CSP not be amended to include Machado Ranch. Doc. 121, September 21, 1995 Letter. From then on, it appears that Campion has been attempting to develop Agua Fria independently from the Villages.

As a separate matter, the Villages, including Wild Wind Ranch, were within the boundaries of the San Luis Water District ("SLWD"). Being part of the SLWD allowed for the possibility of water service for residential use. In July 1994, Campion sought to have Machado Ranch annexed to the SLWD. The process required obtaining approval from several public

agencies and going through public comment.  In July 1995, a draft EIR was released.  In December 1995, Merced County prepared an initial study of annexation.  In September 1994 and May 1996, the SLWD adopted a resolution approving the annexation.  In January 1996, a final EIR was released.  In February 1996, the U.S. Bureau of Reclamation petitioned the State Water Control Board to allow annexation which might lead to municipal and industrial use of water in Agua Fria.  In June 1996, the Merced County Local Agency Formation Commission approved a "Certificate of Completion" authorizing the annexation.  In November 1996, the State Water Resources Control Board formally published a notice of the annexation for public comment.  In June 1997, the State Water Resources Control Board gave approval.  The annexation was completed in October 1998 with the approval of the U.S. Bureau of Reclamation. Doc. 85, November 11, 2003 Letter.  In this process, Campion claims that the U.S. Fish & Wildlife Service and the California Department of Fish & Game presented letters to support residential development on Agua Fria. Doc. 97, Campion Declaration, at 1:16-23.  After annexation was completed, there appears to be no further attempt by Campion to gain the necessary regulatory approvals for residential development.  Campion claims to have heard rumors of the Path 15 project in 1999 or 2000 which deterred him from pursuing his development plans.

Nevertheless, Campion procured an option to purchase land to the east of Agua Fria.[1] Campion has not provided any documentation for the alleged option.  The property ("Bonturi Parcel") comprises 1,300 acres, 215 acres of which Campion sought to include in his residential development.  With the extra land, development on Agua Fria could expand to a total of 1,020 acres and  accord with the U.S. Fish & Wildlife Service's open land requirement.  In October

---

[1]There is uncertainty as to the actions surrounding the proposed acquisition of the Bonturi Parcel.  Campion states he had an option to buy the land. Doc. 97, Campion Declaration, at 12:25-27.  Gimmy states that Campion in fact "entered into an agreement to purchase Bonturi's 1,300 acres for $900,000" on July 9, 2003, a month before the taking. Doc. 98, Gimmy Declaration, at 7:19-20.  He then goes on to say "Campion's purchase agreement on the Bonturi property was cancelled on August 5, 2003. The reason he did not exercise the option was the interference of the transmission line project on Campion's development proposal." Doc. 98, Gimmy Declaration, at 7:24-26.  Gimmy apparently uses the legally distinct terms "purchase agreement" and "option" loosely.

4

1    2003, the Bonturi Parcel was sold for $1.3 million.

2        Since 1994, and the publication of the Villages CSP, the development has been stuck in

3    limbo.[2]  In the spring of 2004, Merced County asked the Villages Consortium to update the

4    Villages CSP to respond to changes in planned development.  In November 2004, Merced

5    County initiated a new EIR for the Villages. See Doc. 89, Villages Initial Study.  East of Agua

6    Fria (and outside the Villages), the Fox Hills development is under construction.  Even if

7    development were to go forward, actual construction of the Villages will occur in phases over an

8    estimated 25 year period, with the specific timetable dependent upon market factors and the

9    availability of public support services/facilities. Doc. 85, Villages Initial Study, at 14.  The

10   County states that additional approvals may be required from the U.S. Army Corps of Engineers,

11   U.S. Environmental Protection Agency, the Central Valley Project, the U.S. Fish & Wildlife

12   Service, the California Department of Fish & Game, and the California Department of

13   Transportation. Doc 85, Villages Initial Study, at 14.

14       At oral argument on October 11, 2005, Defense counsel outlined the steps necessary for

15   development.  First, developers must submit a general plan to the county.  As part of that general

16   plan, the county might require an EIR.  Once the county is satisfied that sufficient information

17   has been presented, the general plan is published for public review and comment.  After hearing

18   from the public, the county considers the general plan for formal approval.  If the general plan is

19   approved, then the county must consider rezoning and amending the county general plans.  At

20   that point, the next step is for the developer to propose a subdivision map for county approval.  In

21   order to gain approval, the developer must have a source of water adequate to supply the housing

22   and approval from the San Luis Water District for service.  Watson says that the requirements are

23   "a Merced County General Plan Amendment, a Zoning Code Amendment, a Specific Urban

24   Development Plan, and Tentative Tract Maps." Doc. 100, Watson Declaration, at 6:26-28.

25       Pursuant to Fed. R. Civ. Proc. 26, Campion provided expert reports from Cindy Sage,

26

27       [2]As part of the Villages, the San Luis Hills development has already been built,
     comprising 58 residential units.  Though it is within the boundaries of the Villages, neither side
28   has explained why it has already been completed though the rest of the Villages awaits approval.

1    environmental planner; Richard Watson, land planner; Arthur Gimmy, real estate appraiser; and

2    Campion himself. Doc. 61.  The Government provided an expert report from Tony Correia, real

3    estate appraiser. Doc. 62.  The Government has filed a motion for summary adjudication and

4    three motions to exclude evidence.  Broadly, the Government seeks a judicial determination that

5    Agua Fria may not be used for residential development.  Related to that goal, the Government

6    seeks to exclude defense experts (Gimmy and Watson) who will testify as to the value of Agua

7    Fria for residential development purposes; Campion's residential development plans; and

8    evidence that high voltage transmission lines preclude the use of Agua Fria for housing.

9

10                                   **II. Legal Standards**

11   **A. Eminent Domain**

12           "The landowner does have the burden of establishing the value of the property subject to

13   condemnation. The landowner may prove the market value of the subject property by submitting

14   evidence of recent sales of similarly situated property. He may also seek to prove the market

15   value by submitting the testimony of expert witnesses who are qualified to appraise the value of

16   the subject property, and who have a factual basis for forming an opinion." United States v.

17   429.59 Acres of Land, 612 F.2d 459, 462 (9th Cir. 1980), citations omitted.  "When the

18   government takes only part of a person's property, and when the value of the remainder

19   depreciates because of the proposed use on the condemned parcel, the owner is entitled to

20   compensation both for that which is physically appropriated and for the diminution in value to

21   the non-condemned property." United States v. 33.5 Acres of Land, 789 F.2d 1396, 1398 (9th

22   Cir. 1986).  Compensation for the diminution in value to the remainder of a property is termed

23   "severance damages." United States v. Miller, 317 U.S. 369, 376 (1943).

24

25   **B. Summary Judgment**

26           Summary judgment is appropriate when it is demonstrated that there exists no genuine

27   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

28   Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v.

1  Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710
2  (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th
3  Cir. 1984).

4      Under summary judgment practice, the moving party "always bears the initial
5  responsibility of informing the district court of the basis for its motion, and identifying those
6  portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
7  together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue
8  of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc.
9  56(c). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,
10  a summary judgment motion may properly be made in reliance solely on the pleadings,
11  depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477
12  U.S. 317, 323 (1986).  Indeed, summary judgment should be entered, after adequate time for
13  discovery and upon motion, against a party who fails to make a showing sufficient to establish
14  the existence of an element essential to that party's case, and on which that party will bear the
15  burden of proof at trial.  "[A] complete failure of proof concerning an essential element of the
16  nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett,
17  477 U.S. 317, 322 (1986).   In such a circumstance, summary judgment should be granted, "so
18  long as whatever is before the district court demonstrates that the standard for entry of summary
19  judgment, as set forth in Rule 56(c), is satisfied." Celotex Corp. v. Catrett, 477 U.S. 317, 323
20  (1986).

21      If the moving party meets its initial responsibility, the burden then shifts to the opposing
22  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.
23  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities
24  Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280
25  (9th Cir. 1979).

26      In attempting to establish the existence of this factual dispute, the opposing party may not
27  rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of
28  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

1  contention that the dispute exists. Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>,

2  391 U.S. at 289; <u>Strong v. France</u>, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must

3  demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

4  suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W.

5  Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that

6  the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

7  the nonmoving party, <u>Anderson</u>, 477 U.S. 248-49; <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d

8  1433, 1436 (9th Cir. 1987).

9      In the endeavor to establish the existence of a factual dispute, the opposing party need not

10  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

11  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

12  trial." <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose

13  of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether

14  there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)

15  advisory committee's note on 1963 amendments); <u>International Union of Bricklayers v. Martin

16  Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir. 1985).

17      In resolving the summary judgment motion, the court examines the pleadings,

18  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19  any. Rule 56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th

20  Cir. 1982).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and

21  all reasonable inferences that may be drawn from the facts placed before the court must be drawn

22  in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>,

23  369 U.S. 654, 655 (1962)(per curiam); <u>Abramson v. University of Hawaii</u>, 594 F.2d 202, 208

24  (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

25  party's obligation to produce a factual predicate from which the inference may be drawn.

26  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

27      Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

28  show that there is some metaphysical doubt as to the material facts....Where the record taken as a

1  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine
2  issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

3

4                           **III. Statement of Undisputed Facts**

5  1. There are no structures on the subject property, excepting the existing and new transmission
6  lines, one old cabin, and working corrals in Section 5. There are also abandoned wind turbines.

7          Disputed. Campion claims there are two wells with pumping facilities on Agua Fria. The
8  court accepts that there are two wells, but notes that the parties agree that any residential
9  subdivision could not be adequately supplied by well water (UMF 10).

10

11 2. The larger parcel consists of 3,220.52 acres of raw grazing land.

12

13 3. The condemnation is for easements for a transmission line, consisting of 74.59 acres for the
14 transmission line and 13.09 acres for access easements.

15

16 4. The property was inspected by appraiser Correia on February 17, 2005, with the effective date
17 of valuation being August 7, 2003, the date of filing a Declaration of Taking.

18

19 5. The property is located about one mile south of State Highway 152, about five miles south of
20 Santa Nella in Merced County.

21

22 6.The property is zoned A-2, exclusive agriculture with a minimum parcel size of 160 acres.

23

24 7. The Merced County General Plan calls for exclusive agriculture in this area. The "Foothills
25 pasture" designation is described in the General Plan, and limits the land to one dwelling per 160
26 acres. Discretionary land use applications, such as new subdivisions, "must be found consistent
27 with the General Plan prior to approval." Developing residential subdivision on the subject
28 property would require amending the General Plan. Residential subdivision of the subject

                                          9

1   property could not have taken place as of August 7, 2003, and could not take place now, without

2   amending both the General Plan and the zoning.  The Gimmy appraisal contains no evidence of

3   similarly situated properties securing amendment of both the General Plan and zoning to permit

4   residential subdivision.  According to Richard Watson, defendant's planning witness, if

5   necessary prerequisites to even applying for a General Plan amendment such as obtaining a water

6   supply were met, the County Board of Supervisors might, or might not, approve an amendment.

7       Disputed.  Campion points to Fox Hill and the Villages as evidence of similarly situated

8   properties, but does not provide evidence that these developments secured amendment of both

9   the General Plan and zoning to permit residential subdivisions.  Campion argues Watson stated

10  the County Board of Supervisors would likely vote for a General Plan amendment and zoning

11  changes.  The court accepts the Government's assertion that approval of these changes by the

12  County Board of Supervisors is not certain.

13

14  8. The property is without a firm, long-term supply of water for any use.  California Water Code

15  section 10910 (SB 610), requires that development have a guaranteed water supply before

16  approval can be obtained to develop the property.  Development could not go ahead at all without

17  the water rights.

18      Disputed. The court accepts that Agua Fria contains wells, but that their output is

19  insufficient for residential subdivision use.  California Water Code §10910 does not require a

20  guaranteed water supply before a plan of development can be approved by the county.  Campion

21  points out that California Gov't Code §66473.7 requires verification of sufficient water supply

22  before the county can approve a development map.  The court accepts Campion's assertion that

23  planning can proceed up to the tentative map stage without a verified water supply.  No project

24  can proceed beyond that point without a guaranteed water supply.

25

26  9. The property was included within the boundary of the San Luis Water District in 1996.  The

27  absence of water allocation for the property is explained succinctly in the November 11, 2003,

28  letter for the Water District.  Gary Sawyers is the General Counsel for the Water District, and is

1   generally familiar with the subject property.  The Water District cannot lawfully provide water to

2   the subject property.  There is increased demand for water in the Central Valley Project system

3   such that there is more competition and it is much more difficult to obtain supplemental water.

4   The Water District has established a policy to stop the policy of stripping water from land and

5   moving it.  Such water is becoming unavailable because it is being committed for permanent

6   crops.  The General Counsel is not aware of any water that is available for sale on a permanent

7   basis.  Also, it would be challenging to find a seller of water from outside the Water District

8   because there are not a lot of sellers out there.  The Gimmy appraisal offers no objective

9   examples of where similarly situated parcels have secured water.

10          Disputed.  Campion clarifies that the November 11, 2003 letter reflects the fact that

11  annexation to the San Luis Water District does not mean Agua Fria is entitled to additional

12  water.  Campion is correct in asserting that the San Luis Water District can comply with law and

13  provide Agua Fria with water.  But the deposition of Gary Sawyers reflects the fact that the San

14  Luis Water District "clearly would not" provide Agua Fria with water as such actions would not

15  serve its interests.  Campion clarifies that the San Luis Water District has recently taken a policy

16  position to stop water stripping, but has not made it a definitive rule.  Gary Sawyers states that he

17  is not aware of any permanent water supply for sale within the San Luis Water District

18  boundaries and that purchase of a permanent supply from outside the boundaries would be

19  difficult.  Arthur Gimmy identified instances where Fox Hills and the Villages obtained water.

20

21  10. Residential subdivision development of the property could not be adequately supplied by well

22  water.

23

24  11. The Santa Nella community area has been designated as a potential growth area within the

25  next 20 years.  The subject property, however, is located within the specific urban development

26  plan area of Santa Nella.

27

28  12. The surrounding area is typically used for native rangeland, with some small highway

1   commercial development north of the property at the intersection of Highways 33 and 152.

2       Disputed. Campion states there is a residential subdivision south of that intersection.

3   Nevertheless, the statement that the surrounding area is typically used for rangeland appears to be

4   true.

5

6   13. Comparable sales of property used for raw grazing in the vicinity ranging in acreage from

7   629.2 acres to 8,825.0 acres and in date from March of 2003, to October of 2003.  These sales

8   reflect grazing land prices of about $414 to about $998 per acre.  The Gimmy appraisal contains

9   no objective evidence of physical differentiation between these local $414-998 per acre sales and

10  the subject.

11      Disputed. Campion disputes that sale of grazing land is comparable.  The court construes

12  them to be sales relevant for determining the value of Agua Fria as grazing land.  Campion also

13  objects to the conclusion that there is no objective evidence of physical differentiation, citing to

14  Gimmy's declaration.  However, the Gimmy declaration discusses the comparability of Agua

15  Fria to the Villages and does not address the comparability of Agua Fria to the grazing land the

16  Government has identified.

17

18  14. The comparable sales claimed by the landowner's appraiser range in acreage from 153 to 457

19  with one exception at 766 acres, range in date from October of 2003 to October of 2004, and

20  range in price from $13,000 to $20,000 per acre.

21      Disputed.  The Gimmy report includes one sale for $22,700 per acre.

22

23  15. All these sales (referred to in Paragraph 14) are closer to Highway 152, Interstate 5, or the

24  intersection of both, than the subject.

25

26  16. Unlike the subject, all these (Paragraph 14) sales are part of the Villages of Laguna San Luis

27  planned development with two exceptions.  One of the exceptions included 200 acres of highway

28  commercial zoning.  The other sale (#6), Fox Hills, included land adjacent to and on both sides

1  of Interstate 5.  The subject property is not within the Villages of Laguna San Luis planned

2  development.

3      Disputed.  Campion states that part of Agua Fria is within the boundaries of the Villages.

4  However, the proposed area to be developed within Agua Fria is not within the boundaries.

5

6  17. All these (Paragraph 14) sales had water at the time of sale with one exception.  The sale (#5)

7  that did not have water included 200 acres zoned highway commercial of the 766.40 acres.  Sales

8  #1 and #3 also included acres zoned highway commercial.

9      Disputed. Gimmy's report states that the parcels involved in comparable sales do not

10  have water supply sufficient for residential development.

11

12  18. The proposed Villages of Laguna San Luis Community Plan <u>does not even include the</u>

13  <u>subject property</u>, and also, the Villages have been in the pipeline seeking approval for a very long

14  time.  Merced County approved an initial Guidance Package for the Villages in 1991.  Informal

15  discussion between the Applicant and Merced County staff had begun in 1989.  The County

16  decided to complete the Notice/New Initial Study in the fall of 2004 "considering the length of

17  time since the original Initial Study was released for this Project (1992) and given the various

18  land use changes that have been added to the proposed CP since that time."  Among many issues,

19  "the San Luis Water District has indicated that adequate water supplies still need to be identified

20  for the proposed community.  The very first benefit listed for the Villages is "Its strong regional

21  access due to its location at the junction of I-5 and SR-152."

22      Disputed. Again, part of Agua Fria is within the Villages.  Otherwise undisputed.

23

24  19. The Planning proposal envisions a new community west of Interstate 5, along State Routes

25  152 and 33, that "would be developed in phases over 25 years."  "Development of the Villages

26  Community will occur in phases over an estimated 25-year period. The phasing of development

27  will be dependent upon development market factors related to the creation of employment

28  opportunities within the Community, and the provision of required services for housing and

1   supporting commercial used."  The subject property is <u>not</u> within the area to be developed if the

2   Villages project eventually does get approved, including the necessary General Plan amendments

3   and rezoning.

4          Disputed.  Again, part of Agua Fria is within the Villages.  Otherwise undisputed.

5

6   20. Out of the subject 3,220 acres, only about 800 to 1,000 acres could be developed even if the

7   property was designated for residential subdivision by the General Plan, zoned to allow the

8   residential use, and had a contract for water.  That is because the property is subject to a 3-to-1

9   ratio, meaning that 3 out of every 4 acres have to be left in open space.  The 3:1 requirement is

10  for mitigation for Kit Fox habitat and other open space uses.  Arthur Gimmy, the landowner's

11  appraiser, valued 2,415 acres at grazing land prices, $1,000 per acre, and valued the 805 acres he

12  contends are developable at $21,000 per acre.

13

14  21. An aerial photograph of the subject property and its general area shows no development of

15  any kind.

16

17  **IV. Discussion**

18  **A. Role of Judge and Jury**

19        The central issue raised in the motion for partial summary judgement is the respective

20  roles of the trial judge and jury in eminent domain cases.  "[T]here is no constitutional right to a

21  jury in eminent domain proceedings...except for the single issue of just compensation, the trial

22  judge is to decide all issues, legal and factual, that may be presented." <u>United States v. Reynolds</u>,

23  397 U.S. 14, 18-19 (1970).  Federal Rules of Civil Procedure 71A(h) states that "If the action

24  involves the exercise of the power of eminent domain under the law of the United States, any

25  tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of

26  just compensation shall be the tribunal for the determination of that issue; but if there is no such

27  specially constituted tribunal any party may have a trial by jury of the issue of just

28  compensation....Trial of all issues shall otherwise be by the court."  "[T]he sweeping language of

the final sentence of the Rule discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial. It is for him to decide 'all issues' other than the precise issue of the amount of compensation to be awarded." United States v. Reynolds, 397 U.S. 14, 20 (1970).

**1. Highest and Best Use**

In determining fair market value, the highest and best use of the taken property is considered. The Government cites to out of circuit cases, saying "there is authority for the proposition that the trial judge should actually determine the highest and best use issue." United States v. 341.45 Acres of Land, 633 F.2d 108, 111 (8th Cir. 1980). The Ninth Circuit pointedly disagrees with that conclusion. "It is not uncommon for expert witnesses to disagree in regard to the highest and best use to which condemned property may be put and as to values based on their respective opinions. Ultimately, this is a question to be decided by the trier of fact, in this case the jury, from the evidence." United States v. 100 Acres of Land, 468 F.2d 1261, 1266 (9th Cir. 1972). "Evidence of reasonable probability of uses [is] admissible and the weight of such evidence [is] to be considered by the trier of fact." United States v. 174.12 Acres of Land, 671 F.2d 313, 316 (9th Cir. 1982). Even if it were proper for a judge to determine the highest and best use, the finder of fact is free to determine the value of the property based upon an alternate use. See Phillips v. United States, 243 F.2d 1, 3-4 (9th Cir. 1957).

**2. Reasonable Probability**

While a jury determines the highest and best use, there is a separate determination of the feasibility of the use. United States v. 320.0 Acres of Land, 605 F.2d 762, 815 (5th Cir. 1979) (recognizing the difference). "[A] property owner need not be compensated for losing the ability to use his land when there is no 'reasonable probability' that such a use will occur." Wash. Legal Found. v. Legal Found. of Wash., 271 F.3d 835, 863 (9th Cir. 2001) (en banc) citing United States ex rel. Tenn. Valley Auth. v. Powelson, 319 U.S. 266, 275 (1943). "[I]t is for the judge to tell the jury the criteria it must follow in determining what amount will constitute just

15

compensation." <u>United States v. Reynolds</u>, 397 U.S. 14, 20 (1970).  The jury's determination of fair value is tightly circumscribed.  In <u>Olson</u>, the U.S. Supreme Court upheld a trial court's decision to exclude evidence of a potential use of property, saying "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value- a thing to be condemned in business transactions as well as in judicial ascertainment of truth." <u>Olson v. United States</u>, 292 U.S. 246, 257 (1934).

Though the plain language of <u>Olson</u> suggests that any factor which is not reasonably probable should be excluded, courts have not applied it dogmatically.  In the open market, many improbabilities are valuable and affect fair market value.  The Ninth Circuit found the trial court erred in instructing a jury to disregard evidence of potential gas or oil extraction since "discovery in land of a reasonable probability of successful development of gas or oil gives great value to such land and that it has a market value even where the prospects of possible successful development are too speculative to be reasonably probable." <u>Phillips v. United States</u>, 243 F.2d 1, 6 (9th Cir. 1957), citations omitted.  Even though it is extremely unlikely the taken land will ultimately be developed into a commercial oil or gas field, the jury can still consider such evidence if there is a reasonable probability that oil companies will attempt to explore the land for such a use.  In <u>Phillips</u>, the area in which the taken land sits had been developed for oil and gas for 14 years and nearly all the surrounding properties had been leased out to oil companies. <u>Phillips v. United States</u>, 243 F.2d 1, 2 (9th Cir. 1957).  Ultimately, review for reasonable probability must mean excluding evidence of valuation that would not be considered by business interests and the broader marketplace in general.  After all, "the desired result is to see that the landowner is put in as good a position pecuniarily as he would have occupied if his property had not been taken." <u>United States v. 100 Acres of Land</u>, 468 F.2d 1261, 1265 (9th Cir. 1972).

**3. Adaptability and Demand**

The broader test of reasonable probability can be restated more explicitly as a requirement

1  that "The highest and most profitable use for which the property is adaptable and needed or likely

2  to be needed in the reasonably near future is to be considered, not necessarily as the measure of

3  value, but to the full extent that the prospect of demand for such use affects the market value

4  while the property is privately held." Olson v. United States, 292 U.S. 246, 255 (1934).  The

5  Government seeks to exclude evidence under the argument that (1) Agua Fria is not adaptable to

6  residential subdivisions due to water and zoning issues and (2) there is a lack of demand for that

7  use in the near future. Doc. 89, Government's Brief, at 5:1-2.

8      Juries make the ultimate determination whether a need will arise in the near future as

9  need is a measure of market demand.  The question of adaptability is more complex because

10  courts must determine the legal rights that attach to land.  These issues are wide and varied. See

11  National R. Passenger Corp. v. One 25,900 Square Foot, 766 F.2d 685, 689 (2nd Cir. 1985)

12  (error for trial court to allow jury to decide whether property had road access); United States v.

13  5677.94 Acres of Land, 162 F. Supp. 108, 121 (D. Mont. 1958) (trial judge determines whether

14  property had navigable river access); Scott Lumber Co. v. United States, 390 F.2d 388, 394 (9th

15  Cir. 1968) (error for trial court to deny motion for new trial when expert witnesses testified to

16  value of land based on clear cutting lumber, "Such method is contrary to the public policy and

17  laws of the State of California, and contrary to the Forest Practice Rules and Regulations of the

18  Forest District of the State of California in which [the land] is located").  Whether a use is legally

19  permitted on a piece of land is a judgement the court makes.

20      Determining who makes the decision regarding the likelihood of future changes to legal

21  rights is not completely clear.

22      Construing governmental regulations is of course a paradigmatic judicial function. With
    respect to this issue, there is no room for a division of fact-finding responsibilities

23  between judge and jury. There are no "if's," "and's," "but's," or "maybe's" for the jury to
    consider. A legal restriction either applies to the proposed use or it does not -- and that is

24  a quintessential question of law for the judge to decide. However, it is not at all
    uncommon within regulatory systems for permits or variances to be granted, or for the

25  regulations themselves (especially zoning regulations) to be changed. And since the
    prospect of obtaining a permit or a change of zoning classification is a factor that might

26  well be considered by a prospective purchaser, and thus a factor affecting the price a
    willing buyer would pay for the property, it will often represent an element of fair market

27  value. Accordingly, it is well settled law that if the landowner can demonstrate a
    "reasonable possibility" that a permit would be issued or that rezoning will occur, thereby

28  freeing the property for a use which otherwise would be precluded by regulatory

17

> restrictions, the owner is entitled to have that 'reasonable possibility' considered by the jury, provided of course that the use is otherwise a practicable and reasonably probable one. We emphasize, however, that it is for the judge to determine whether this "reasonable possibility" exists. If and only if he finds that it does exist, then the jury must consider and decide what effect this reasonable possibility of a permit or zoning change has upon the fair market value of the condemned property.

United States v. 320.0 Acres of Land, 605 F.2d 762, 819 (5th Cir. 1979).  Yet, in the same opinion, the Fifth Circuit also said,

> in deciding whether there is sufficient evidence for the jury or commission, the judge should not resolve questions of credibility. Nonetheless, a party obviously cannot make out a jury question simply be asserting that a particular use is reasonably practicable and reasonably probable, or that there is a reasonable possibility of obtaining a permit; as with all opinion evidence, there must be some foundation in fact. Nor is the judge constrained to admit inherently incredible testimony. The guiding consideration should be: could the jury (or comission) reasonably conclude that the potential for this use affects the fair market value of the property?

United States v. 320.0 Acres of Land, 605 F.2d 762, 819 n.130 (5th Cir. 1979).  While the first cited passage puts the factual question of reasonable possibility of future zoning change in the hands of the trial judge, the second passage suggests that the decision rests with the jury with the judge making a summary judgement-like determination for sufficiency of evidence.

In dealing with similar issues, the Third Circuit upheld a trial judge's exclusion of evidence supporting commercial use of property that was zoned for agriculture using a summary judgement-like standard.  Fed. R. Civ. Proc. 71A(h) "mandated that the district court screen the proffered commercial use to determine whether the [landowner] had demonstrated that a commercial use of the condemned tract was practicable and reasonably probable." United States v. 27.93 Acres of Land, 924 F.2d 506, 512 (3rd Cir. 1991).  The landowner had "the pretrial burden of showing that the condemned tract is adaptable and needed or likely to be needed in the reasonably near future for commercial use" and must show "by a preponderance of the evidence, that a jury could reasonably find that the condemned tract would be rezoned commercial." United States v. 27.93 Acres of Land, 924 F.2d 506, 512 (3rd Cir. 1991), citations omitted.

The Eighth Circuit explicitly adopted the standard used in 320.0 Acres of Land though the opinion dealt with the reasonable probability of future demand and not zoning. United States v. 341.45 Acres of Land, 633 F.2d 108, 111 (8th Cir. 1980).  In distilling the standard, the Eighth Circuit provided the following formulation:

First, the trial judge should screen the evidence concerning potential uses. Then, the trial judge should decide whether the landowner has produced credible evidence that a potential use is reasonably practicable and reasonably probable within the near future. If credible evidence of the potential use is produced, the jury then decides whether the property's suitability for this use enhances its market value, and, if so, by how much. The trial judge's screening of the evidence does not require an extensive and detailed review of all the evidence. Rather, the judge need only find that there is credible evidence that the property is adaptable to the use and that there will be a need or demand for such use in the near future.

United States v. 341.45 Acres of Land, 633 F.2d 108, 112 (8th Cir. 1980), citing United States v. 320.0 Acres of Land, 605 F.2d 762, 815-17 (5th Cir. 1979).

This court concludes that the ultimate determination of both prospective demand and prospective changes to the legal rights attached to land is for the jury. The landowner need only produce credible evidence of reasonable probability that legal changes and new demand will permit a use to be feasible in the near future. After evidence is presented, the jury should be given an instruction to ignore improbabilities. See United States v. 174.12 Acres of Land, 671 F.2d 313, 315 n.2 (9th Cir. 1982) ("you should not consider as a factor affecting value anything which depends upon events or combinations of occurrences, which, while within the realm of possibility, are not fairly shown to be reasonably probable. Such matters should be excluded from your consideration").

**4. Water**

Gimmy states that under state law, "you have to provide a guaranteed water supply....Before you can get approval to develop." Doc. 89, Gimmy Declaration, at 91:19-23. Campion admits the plans for development can only proceed up to the subdivision map stage before a guaranteed water supply must be procured. Campion argues that the course developers take is to "first secure the property to be developed and obtain a degree of certainty as to probability of approval, then purchase the necessary properties to transfer water to the desired site." Doc. 105, Campion's Opposition, at 7:28-8:2. Campion claims that water can be procured for development on the open market. Doc. 96, Campion's Opposition, at 7:11-26. Gimmy has "interviewed the San Luis Water District Manager, David Coxey...and general counsel, Gary Sawyers. Both of these individuals stated that the purchasing of water rights for

1  residential development projects has been an on-going practice in the San Luis Water District

2  during the recent past. The practice of purchasing water rights for development has been done

3  (and is continuing to be done) by the developers of Fox Hills and Villages." Doc. 98, Gimmy

4  Declaration, at 6:15-24.  Campion states he had two wells on Agua Fria.  Further, he owned land

5  within the San Luis Water District which gave him water rights sufficient for development on

6  319.7 acres of land.  He also claims to have had option contracts for water rights sufficient to

7  supply another 343 acres from other land within the San Luis Water District. Doc. 97, Campion

8  Declaration, at 12:19-4.

9       The Government provides the declaration of Gary Sanders who states he was not aware of

10  any permanent water available for sale. Doc. 89, Sawyers Declaration, at 29:18-24.  With respect

11  to the practice of purchasing land with water attached and then "mov[ing] the water associated

12  with the land to the land they intend to develop," Sawyers said "In other words, they have

13  stripped water off of land and they have moved it. The San Luis Water District board has recently

14  taken a policy position that it wants to put a halt to that practice." Doc. 89, Sawyer Declaration,

15  at 28:1-15.  He went on to say "It's not to say that the district won't allow it in the future, but

16  they will be taking a harder look at it." Doc. 89, Sawyers Declaration, at 28:24-29:1.  Due to the

17  ever present prospect of drought and across the board reduced allocations of water, the San Luis

18  Water District Board requires housing developers to secure four times the necessary water in

19  order for approval of service. Doc. 112, Ex. A, Sawyers Deposition, at 19:22-22:8.  The San Luis

20  Water District determined that Agua Fria will require up to 2,176 acres worth of water for

21  development. Doc. 112, Ex. B, Nov. 11, 2003 Letter, at 3.

22       The fact that nearby landowners have purchased land to strip its water for development

23  and are continuing to do so suggests that the practice is viable notwithstanding the San Luis

24  Water District's policy position.  Sawyers admits that there have been sales of water in the recent

25  past. "[T]here are not a large number of these transactions. But there have been, to my

26  knowledge, at least five successful assignments of CVP water contracts from the original

27  contractor to an assignee contractor in the last five or six years." Doc. 103, Sawyers Deposition,

28  at 118:8-13. [T]he district has very liberal policies with respect to allowing landowners to

1    transfer that water among themselves." Doc. 89, Sawyers Deposition, at 27:24-28:1. [T]here have

2    been some acquisitions by development interests in the last year or so of water from outside of

3    the San Luis Water District that will be moved into the San Luis Water District. The process of

4    doing that requires a number of regulatory approvals. Those are probably a year or so away. But

5    there have been on the order of 2,500 acre feet of water supply entitlement that have been

6    acquired by development interests within the district that will be moved into the district." Doc.

7    103, Sawyers Deposition, at 30:12-22.  The Government's own expert, Tony Correia, admitted at

8    deposition "Mr. Campion could have found a source of water." Doc. 103, Ex. B, Correia

9    Deposition, at 118:18-25.  On balance, Campion has provided sufficient evidence on water

10   availability to put the issue in front of a jury.

11

12   **5. Zoning**

13        In order for residential development to take place on Agua Fria (currently zoned for

14   agriculture), Merced County must approve a general plan, rezone for residential use, and

15   ultimately approve a subdivision map.  "[T]he availability of land for a use which is prohibited

16   by law cannot be considered in determining its value in eminent domain proceedings." Scott

17   Lumber Co. v. United States, 390 F.2d 388, 395 (9th Cir. 1968), citations omitted.  The

18   Government argues that Merced County's General Plan does not allow residential use on the

19   property, and does not call for eventual residential use on the property." Doc. 89, Government's

20   Brief, at 7:20-22.

21        Campion states "Both the County planning staff and the board of supervisor for western

22   Merced County have stated the County's support of the Agua Fria Village proposed

23   development." Doc. 97, Campion Declaration, at 11:1-3.  He is backed by Watson, who says

24   "Robert King, County Planner for West Side Specific Urban Development Plans, and Jerry

25   O'Banion, Merced County Supervisor, both indicated during discussions that the County would

26   be receptive to a plan for the Agua Fria property that would implement County General Plan

27   goals and policies, was accompanied by implementation measures similar to those in the Villages

28   of Laguna San Luis Community Plan, was in the water district, and provided appropriate kit fox

21

1  mitigation. The non-prime soils of Agua Fria make it attractive for urban development in

2  a county that values prime agricultural soils." Doc. 100, Watson Declaration, at 6:28-7:7.

3  Merced County's Year 2000 General Plan (adopted in 1990) noted that since growth of existing

4  urban centers would be at the expense of the most productive agricultural soils, establishing new

5  urban areas on lesser agricultural lands would be favored. Doc. 121, at I-6.

6          Campion has relied heavily on the progress of the Villages to demonstrate that Merced

7  County may be favorably inclined to allow development on Agua Fria.  In 1995, Campion sought

8  to have the remainder of Agua Fria not already within Villages boundaries annexed to the

9  Villages.  Merced County's planning department recommended that action not be taken due to

10  the lack of environmental studies.  However, the Assistant Planning Director wrote that "It would

11  also be made clear that proposed SUDP expansions simply to accommodate more urban land

12  area would not be contemplated until significant amounts of development had occurred and

13  adequate infrastructure has been installed." Doc. 121, September 15, 1995 Letter, at 3.  Though

14  the tone of the letter is somewhat negative, it does demonstrate that Merced County had not

15  foreclosed the prospect of residential development of Agua Fria down the line.  The issue must

16  go to a jury.

17

18  **6. Demand for Housing**

19          The Government argues that Agua Fria can not be valued as based on residential use

20  because the demand for such use will not fully arise for quite some time.  As evidence, the

21  Government notes that the Villages of Laguna San Luis Community Plan states that the

22  community would be developed in phases over 25 years, a timetable which itself depends upon a

23  number of favorable assumptions. Doc. 92, Statement of Undisputed Material Facts, at 5:16-24.

24  The State Water Resources Control Board states its opinion that residential development on

25  Agua Fria would not be completed until 20 years after all approvals have been obtained. Doc.

26  112, Nov. 11, 2003 Letter, at 3.  Since actual construction and sale of residential units on Agua

27  Fria would not take place for many years, the Government argues that such a use does not satisfy

28  the requirement that fair value be based on a use "reasonably probable in the near future." Doc.

1    89, Government's Brief, at 7:12-13.

2         It appears that the Government has conflated the market for individual residential units

3    and development land.  In the near future, there is unlikely to be a demand for residential units of

4    the level that would fill an 805 acre development.  However, there is current demand for

5    development land in the area.  While Campion would not be allowed to present evidence that

6    Agua Fria should be valued based on sales of individual residential units, that does not bar him

7    from presenting evidence of Agua Fria's value to real estate developers for ultimate residential

8    purposes.  The case of 99.66 Acres is instructive.  When dealing with a "ten year old paper

9    subdivision and nothing more," the court determined "the appropriate market was for the entire

10   tract as investment property for future subdivision development." United States v. 99.66 Acres of

11   Land, 970 F.2d 651, 655 (9th Cir. 1992).  Granted, the development in 99.66 Acres had

12   proceeded much farther than the highly theoretical planning involving Agua Fria, but that simply

13   emphasizes the fact that "a potential future use of condemned property should be considered not

14   as the present measure of value but only to the extent that the prospect of demand for such use

15   would have affected the price a willing buyer would have offered for the property just prior to the

16   taking." United States v. Benning, 330 F.2d 527, 532 (9th Cir. 1964).  Conceptually, there is no

17   current market for residential units but there may be a market for development land.

18        In a bench trial, a trial judge stated "You can't say that a significant element of the value

19   of this property is the prospect of urbanization if you really believe that that prospect will not be

20   realized for a period of 15 to 20 years." United States v. 50.50 Acres of Land, 931 F.2d 1349,

21   1360 (9th Cir. 1991).  But, the Ninth Circuit appears to take a broader view of evidence

22   supporting anticipated demand in the near future.  In one case, the Ninth Circuit has approved of

23   admitting evidence even when there had been little demonstrated development on the ground.

24   Regarding four properties in the then rural areas of Ventura County:

25        landowner witnesses did testify that there would have been an immediate market for
          subdivisions on V-R Ranch property; that there were buyers in the market that would
26        have been interested in subdividing part of the Benning land immediately, and that it was
          probable that the same immediate development could have taken place in the category of
27        country estates. A tentative subdivision map for 250 acres of the V-R Ranch property had
          been filed and approved by the County Planning Commission a year before the take.
28        Residential subdivision development in the direction of the town of Ojai (at a distance of

                                          23

six miles) had spread quite close to the Dunshee, Benning and Battin properties. While one witness respecting the Dunshee and Battin properties was less optimistic as to residential use in the immediate future, he did testify that it was quite likely that these properties at the time would have interested 'many, many buyers' of subdivision property (known among subdividers and land developers as 'stock-pilers' or 'inventory buyers') who would not have plans for immediate development but would invest for future development

United States v. Benning, 330 F.2d 527, 532 (9th Cir. 1964).  Though the Dunshee and Battin properties were undeveloped, the presence of other residential developments in the area that were farther advanced supported the conclusion there would be demand.

Similarly, the Villages project, Fox Hills, and the existing 58 units of San Luis Hills supports Campion's assertion that there will be demand for housing in the not too far off future. Campion has demonstrated sufficient potential demand for the use of residential development for the issue to be considered by a jury.

**B. Gimmy Testimony**

Arthur Gimmy, a real estate appraiser, is Campion's expert witness.  Gimmy has valued Agua Fria based on the assumption that residential development was the highest and best use. He concluded that the 805 acres of Agua Fria marked for development was worth $21,000/acre and the remaining 2,415 acres of Agua Fria planned for mitigation was worth $1,000/acre as of August 7, 2003.  In making this valuation, Gimmy relied on nine other land sales in the area (seven for development and two for mitigation). Doc. 85, Gimmy Report, at 22-24.  As a measure of Campion's loss, Gimmy provided three scenarios: (1) consideration of Agua Fria; (2) consideration of both Agua Fria and the Bonturi Parcel; and (3) consideration of Agua Fria's projected value if the prospect of the transmission line and government taking had not been discussed starting in 2000. Doc. 85, Gimmy Report, at 1:8-3:6.

The Government moves to have Gimmy's testimony concerning Agua Fria's valuation excluded due to (1) failure to consider the uncertainty of development, (2) use of sales that are not comparable, and (3) Scenario 2 improperly calculated damages from property Campion did not own. Doc. 85, Government's Brief, at 1:8-3:6.  In addition, the Government also argues that Gimmy's valuation for Scenario 3 does not have a sufficient factual basis. Doc. 85,

1    Government's Brief, at 9:17-10:14.

2

3    **1. Uncertainty of Development**

4        "An expert witness may give his opinion based on assumptions stated by him. However,

5    if the assumptions needed to support the opinion are not proved, or at least testified to, and are

6    not otherwise taken to be true, the opinion is worthless." United States v. Cooper, 277 F.2d 857,

7    860 (5th Cir. 1960).  The Government asserts that Gimmy has not considered the impact of the

8    uncertainty in rezoning and procuring an adequate water supply in valuing Agua Fria, rendering

9    his testimony inadmissible. Doc. 85, Government's Brief, at 15:12-16:8.

10        However, the papers show Gimmy did not consider zoning and water issues to be

11    resolved; "The land was not appraised on the basis of an approved development plan." Doc. 98,

12    Gimmy Declaration, at 6:15-17.  As part of his study, Gimmy interviewed Sawyers and the

13    former San Luis Water District Manager, David Coxey on water issues.  Doc. 98, Gimmy

14    Declaration, at 2:28-3:1.  In response to a question regarding "the tasks required of a property

15    obtaining water when it did not earlier have water for purposes of rezoning it for commercial

16    uses or residential uses," Gimmy admitted he is "not expert on the subject, although I have

17    researched it for this assignment. And I have also researched what people are paying for water

18    and some of the mechanisms they go through in order to be able to provide municipal water to

19    projects." Doc. 112, Gimmy Deposition, at 25:16-26:2.  His conclusion is that the water issues is

20    "a matter of money, because I know of transactions that are taking place. And it's just a matter of

21    buying." Doc. 112, Gimmy Deposition, at 115:22-25.  Based on these facts, it is clear Gimmy has

22    considered these issues.  An expert witness might validly conclude that the developmental

23    hurdles will ultimately be surmounted. United States v. 429.59 Acres of Land, 612 F.2d 459, 463

24    (9th Cir. 1980) ("The record shows that the landowner's expert witness...took the effect of

25    environmental concerns into account in making his appraisal of the subject property....[the

26    expert] was aware of the environmental concerns, but still concluded that the permits and

27    agreement would be obtained").

28        The Government suggests "The Court should not allow defendant to recover based on

1  speculative and conjectural estimates regarding the likelihood of development, as well as what

2  the development would have been worth if it had ultimately been complete." Doc. 85, at 19:24-

3  27.  Gimmy's estimate of damages is not based on a calculation of the value of completed

4  housing units (lot method), but rather a parcel as a whole in its present state.  As he says "it was

5  not appraised according to a land residual process, which considers the ultimate development and

6  what it could sell for and then deducts the costs of development to determine the land's

7  contribution to value." Doc. 98, Gimmy Declaration, at 3:2-3.

8

9  **2. Comparable Sales**

10      "The sales of other property must in fact be comparable to be admissible. It follows that

11 when evidence pertaining to an assertedly comparable sale is tendered, and objection is made

12 thereto, a preliminary question of admissibility is presented. The determination of that question

13 calls for an exercise of a sound discretion by the trial court, and the ruling thereon is reviewable

14 only for abuse of discretion." United States v. 55.22 Acres of Land, 411 F.2d 432, 434 (9th Cir.

15 1969), citations omitted.  "[S]ales of other property are not admissible unless the other property

16 is comparable. And comparability, while it does not mean identity, because each parcel of real

17 property differs from every other parcel, does mean, at the very least, similarity in many

18 respects." Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 172-73 (9th Cir. 1962).

19 However, there is a distinction between admitting a comparable sale as direct proof of a

20 property's value and allowing an expert to refer to the comparable sales in explaining his/her

21 own valuation of a property.

22          In the determination of the fair market value of property taken in a condemnation
           case, evidence of the price for which similar property has been sold in the vicinity may be

23         admissible upon two separate theories and for two distinct purposes. First, such evidence
           may be admissible as substantive proof of the value of the condemned property, or

24         secondly it may be admissible, not as direct evidence of the value of the property under
           consideration, but in support of, and as background for, the opinion testified to by an

25         expert as to the value of the property taken.
               The rule is well settled in most jurisdictions that ordinarily the value of lands, or

26         interests in realty, at a particular time, may be proved by evidence of voluntary sales of
           similar property in the vicinity made at or about the same time. And although there is

27         some conflict in the decisions, we think the better rule is that where the opinion of an
           expert witness is based in part on such sales, he should be permitted to give the details of

28         the sales upon which he bases the opinion, although the facts so stated do not become

1   independent evidence.

2         Quite obviously when evidence of the price for which similar property has been
    sold is offered as substantive proof of the value of the property under consideration, a
3   foundation should be laid showing that the other property was sufficiently near that in
    question, and that it was sufficiently like the property in question as to character,
4   situation, usability and improvements to make it clear that the two tracts were comparable
    in value. However, where evidence of sales of similar property is offered not as
5   substantive proof of value, but merely in support of, and as background for, the opinion
    of an expert as to the value of the land in question, the requirement of such foundation is
6   not so strict...If the expert has made careful inquiry into the facts (of such sales), he
    should be permitted to give them as the basis of the opinion he has expressed. If he had
7   not made careful inquiry, this will be developed on cross examination.

    United States v. Johnson, 285 F.2d 35, 40-41 (9th Cir. 1960), citations omitted.

8         Neither the Government or Campion makes this distinction.  Based on the parties' use of

9   the sales, it appears that Campion does not seek to have the sales independently admitted as

10  direct evidence of the value of Agua Fria.  The court assumes that Campion seeks to admit

11  evidence of comparable sales solely as background for Gimmy's opinion.

12        "[A] potential future use of condemned property should be considered not as the present

13  measure of value but only to the extent that the prospect of demand for such use would have

14  affected the price a willing buyer would have offered for the property just prior to the taking."

15  United States v. Benning, 330 F.2d 527, 532 (9th Cir. 1964).  Evidence of comparable sales must

16  take the factor of uncertainty into account.  Even though Campion can present evidence that

17  Agua Fria may be used as residential subdivision land, Agua Fria should not be fully valued as

18  residential subdivision land given the uncertainty over its development prospects.  Effectively,

19  Agua Fria's value as residential development land must be discounted based on the possibility

20  that it would not in fact be used as residential subdivision land; the higher the risk that

21  development would not take place, the greater the discount.  This framework is consistent with

22  the Gimmy's report. Doc. 61, Gimmy Report, at 18.  Gimmy characterized Agua Fria as

23  "predevelopment land." Doc. 61, Campion Report, at 29.  Campion partially avoids this problem

24  by not comparing the value of Agua Fria to completed residential subdivisions like San Luis

25  Hills.  Instead, Gimmy relies on sales of other properties that are in the process of development.

26        Nonetheless, the Government argues that the sales Gimmy relies on in his report are not

27  comparable in that "none...are as large as Agua Fria, and all such properties are either zoned for

28  more profitable uses or obtained water at the sale." Doc. 85, Government's Brief, at 21:8-11.  In

1   one case, the Fifth Circuit upheld the trial court's exclusion of the landowner's initial purchases

2   of the property the government was seeking to take.[3]  The court reasoned that 7 years had passed

3   since the earlier sales, the potential uses of the property changed, the previous purchases were of

4   either larger or smaller parcels, and the previous purchases had different access to transportation

5   (rail service). United States v. 33.90 Acres of Land, 709 F.2d 1012, 1014 (5th Cir. 1983).

6   Gimmy's report relies on seven sales of land that are intended for residential housing and two

7   sales that are intended to satisfy the open land requirement of the U.S. Fish & Wildlife Service.

8   Doc. 61, Gimmy's Report, at 22-25.  There is no dispute over the valuation of mitigation land.

9   The seven parcels that are slated for development will be examined with reference to the three

10  factors identified by the Government: size, zoning, and water.  Of the seven, five parcels are

11  within the boundaries of the Villages and are part of that development effort.

12      Gimmy's analysis of Agua Fria assumes an 805 acre development in Scenario 1.  The

13  residential development sales he compares Agua Fria to have acreage that range from 153 acres

14  to 766 acres, with four in the 250-400 acre range.  In terms of size, a factor of two difference may

15  be considered significant. See United States v. 33.90 Acres of Land, 709 F.2d 1012, 1014 (5th

16  Cir. 1983) ("prior sales were significantly larger (62.6 acres and 170.45 acres) or smaller (2

17  acres) than the condemned parcel (33.9 acres)).  When dealing with parcels of different size, the

18  smaller is more valuable per acre. United States v. Eastman, 528 F. Supp. 1184, 1186 (D. Or.

19  1981) ("if the comparable is a smaller parcel than the subject property, in general a downward

20  adjustment is made. This is on the basis that, all other things being equal, smaller parcels bring a

21  higher per-acre price than larger parcels because the total dollar price is less and more potential

22  buyers exist for a lower rather than higher priced piece of property").  However, a difference in

23  size of parcel alone does not necessarily render a sale useless for comparable sale analysis.

24      Agua Fria is zoned A-2, exclusive agricultural use.  Of the seven parcels, Gimmy relied

25  on, three have portions that are zoned H-I-C.  Campion describes an H-I-C zoning designation as

26

27      [3]The landowner made several earlier purchases to create a 234 acre parcel of which the
28  government was seeking 33.9 acres.

1   "a holding zone for any property within one mile of the junction of I-5 and Highway 52." Doc.

2   105, Campion's Opposition, at 8:17-18.  The Government describes them simply as having

3   "already been rezoned for commercial use." Doc. 112, Government's Reply, at 20:17-20.

4   Gimmy similarly referred to the H-I-C zoning designation as "commercial". Doc. 61, Gimmy

5   Report, at 23.  Campion admits that the built up area of the Villages includes not only a 58 unit

6   residential development, but also "a commercial truck stop, hotel, water and wastewater

7   treatment plants, gas station and a restaurant." Doc. 97, Campion Declaration, at 3:5-6.  The

8   truck stop, hotel, gas station, and restaurant would presumably be permitted under an H-I-C

9   zoning as support services for highway travelers.  Even if residential development were

10  ultimately to fail in the area overall, land zoned H-I-C should have residual value for those uses.

11  That possibility is an important dissimilarity.

12       With reference to water, it appears that none of the five Villages parcels Gimmy

13  examines has sufficient water for development.  Though his report does note that many sales

14  came with contract water from the San Luis Water District, the Water District "finds that given

15  its current...water supply contract and constraints associated therein, it has insufficient water

16  supplies to serve the Villages project." Doc. 121, Draft Water Supply Assessment, at 7.  While

17  the precise amount of water needed to develop those parcels is not specified, it must be accepted

18  that the sale did not include sufficient amounts.  In relation to water, all the parcels relied on are

19  similar to Agua Fria.

20       Gimmy's sale number 5 (I-5 City) is outside of the Villages and straddles I-5 next to that

21  route's intersection with State Road 152.  Of the 766 acres, 200 acres have the H-I-C zoning

22  designation. Doc. 61, Gimmy Report, at 23.  Gimmy's sale number 6 (Fox Hills) is part of a

23  residential complex outside of the Villages that also straddles I-5.  The Fox Hills sale took place

24  on April 30, 2003, and Gimmy states that it was already under construction as of February 23,

25  2005. Doc. 61, Gimmy Report, at 22-23.   Campion argues that "Gimmy's analysis does not

26  utilize sales with firm water and already general planned or rezoned for development." Doc. 105,

27  Campion's Opposition, at 10:28-11:1.  But, Campion reverses himself and says that Fox Hills

28  "had a tentative map. This sale property's map was dated and not in keeping with the current

29

planning concepts of the County." Doc. 105, Campion's Opposition, at 7:13-14.  Regardless,
Watson claims that "three years is a reasonable time for processing large scale planned
communities through the General Plan and Zoning Amendment Processes; the time frames could
be even shorted in Merced County." Doc. 61, Watson Report, at 6.  It is plain that the
development process of Fox Hills must have been much farther along than it was for Agua Fria
and unspecified aspects of that parcel made it much easier to get the necessary approvals.
Though Campion states the Fox Hills "sale property is inferior in terms of location and
configuration to Agua Fria," it should be noted that Fox Hills has not only started construction,
but the scope of the development has already expanded beyond its original boundaries. Doc. 105,
Campion's Opposition, at 7:14-15; Doc. 61, Gimmy Report, at 30-31.  The five other sales are
within the Villages and are all west of I-5.

There are serious questions as to the comparability of I-5 City and Fox Hills.
Nonetheless, they are not being offered as direct evidence of value.  As such, they are admitted
pursuant to the Ninth Circuit's admonishment that "If the expert has made careful inquiry into
the facts (of such sales), he should be permitted to give them as the basis of the opinion he has
expressed. If he had not made careful inquiry, this will be developed on cross examination."
United States v. Johnson, 285 F.2d 35, 41 (9th Cir. 1960).

**3. Scenario 2**

Scenario 2 of Gimmy's report calculates damages on the assumption that the Bonturi
Parcel can be used as additional mitigation land when considering what portion of Agua Fria can
be developed as residential subdivisions.  Campion claims to have had an option contract to
purchase the Bonturi Parcel (1,300 nearby acres) at the time eminent domain proceedings were
instituted on August 7, 2003.  The purchase might have permitted Campion to expand
development on Agua Fria from 805 acres to 1,020 acres due to increased mitigation land.
Gimmy calculates damages from the taking to be $16,358,000, an increase of $1,700,000 over

1    Scenario 1.[4]

2        Campion argues that the option shows a reasonable probability that the Bonturi Parcel

3    would be combined with Agua Fria to support residential development of 215 additional acres.

4    In stating that a landowner can not rely on the prospect of assembling additional parcel through

5    eminent domain to boost the value of the parcel to be taken, the U.S. Supreme Court found:

6            An owner of lands sought to be condemned is entitled to their market value fairly
             determined. That value may reflect not only the use to which the property is presently
7            devoted but also that use to which it may be readily converted. In that connection the
             value may be determined in light of the special or higher use of the land when combined
8            with other parcels; it need not be measured merely by the use to which the land is or can
             be put as a separate tract. But in order for that special adaptability to be considered, there
9            must be a reasonable probability of the lands in question being combined with other tracts
             for that purpose in the reasonably near future. In absence of such a showing, the chance of
10           their being united for that special use is regarded as too remote and speculative to have
             any legitimate effect upon the valuation.

11   United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 275-76 (1943),

12   citations omitted.  Campion states that reasonable probability of combination with the Bonturi

13   Parcel is present in this case.  However, courts have construed "reasonable probability" in this

14   context quite strictly.  Campion cites to the Federal Circuit, in a case which dealt with five strips

15   of land intended for a future road which cut through a larger parcel of open land. Board of

16   County Supervisors v. United States, 276 F.3d 1359, 1361 (Fed. Cir. 2002).  The open land was

17   owned by a real estate developer.  The developer had agreed to dedicate the five strips to the

18   municipality for a road through the eventual development.  When the federal government took

19   the whole of the property (five strips and the larger parcel slated for development), the

20   municipality received compensation for the land on which the future road was to be built.

21   Ultimately, the Federal Circuit found sufficient evidence to support a finding that "there was a

22   
23       [4]In fact, Gimmy's analysis regarding Scenario 2 miscalculates damages to Campion's
     detriment.  Gimmy states the after condition value as $4,520,000, by considering both Agua Fria
24   and the Bonturi Parcel.  In the before condition, he only considered Agua Fria and the cost of
     acquiring the Bonturi Parcel, excluding the acreage of the Bontury Parcel.  Gimmy compares a
25   before condition containing 3,220 acres with an after condition containing 4,520 acres.  He
     should have excluded the Bonturi Parcel to arrive at an after condition value of $3,220,000.
26   Alternatively, Gimmy could have valued the before condition by including the Bonturi Parcel as
     mitigation land valued at $1,000/acre.  Using either method (and assuming the legal theory
27   behind Scenario 2 is viable), Campion's damages are $1,300,000 more than Gimmy's figure.
28

1   reasonable probability that the [five strips] was physically adaptable for assemblage with

2   adjoining properties, and also that there was a demand for assemblage at the time of the taking."

3   Board of County Supervisors v. United States, 276 F.3d 1359, 1365 (Fed. Cir. 2002).  In finding

4   that development plans are often subject to change which requires a redrawing of roads, the court

5   allowed the five strips to be valued as part of the larger development instead of limiting its value

6   to that of a roadway.

7         In making this decision, the Federal Circuit noted that "Courts in some jurisdictions allow

8   consideration of evidence of assemblage only if all the parcels to be assembled are owned by the

9   same party." Board of County Supervisors v. United States, 276 F.3d 1359, 1365 n.1 (Fed. Cir.

10  2002).  The Ninth Circuit is one such jurisdiction.  "Where part of a tract in fee ownership is

11  condemned, the loss in market value of the remainder cannot be augmented by consideration of

12  the damage caused thereto by the taking or prospective use of lands held by third parties in fee

13  simple as part of the same project. Nor can the fact that an enterprise upon one parcel depends

14  upon other lands in fee ownership of third parties for supply of an essential material be used to

15  connect the two for purposes of compensation." United States v. Honolulu Plantation Co., 182

16  F.2d 172, 179 (9th Cir. 1950).  This holding was reiterated in United States v. 87.30 Acres of

17  Land, 430 F.2d 1130, 1133 (9th Cir. 1970).  Presentation of the issue to a jury is only proper

18  when ownership itself is in question.  In a case where the taking was initiated in the middle of

19  legal title transfer (escrows in existence), the Southern District said "'reasonable probability' of

20  unitization or use of parcels in combination is a question of fact to be presented to the jury or the

21  trier of fact." United States v. 3276.21 Acres of Land, 194 F. Supp. 297, 302 (S.D. Cal. 1961).

22        Furthermore, the Ninth Circuit rule is that severance damages may only be recovered if

23  the parcels are contiguous or if actual and permanent use create a unitary purpose between non-

24  contiguous parcels. United States v. 87.30 Acres of Land, 430 F.2d 1130, 1133 (9th Cir. 1970).

25  The Bonturi Parcel does not adjoin Agua Fria. See Doc. 97, Campion Declaration, Ex. L.  While

26  Campion may have planned for a unitary purpose between Agua Fria and the Bontury Parcel, that

27  us was not actual and permanent as of the date of the taking.

28        As a separate wrinkle, there is no documentation to show that the option contract was

1    actually enforceable.  As far as the court can tell, no copy of the option contract was provided.

2    Campion has not shown that the option was enforceable (consideration, statute of frauds).  If the

3    option was unenforceable, it may be likened to a revocable permit.  Compensation under eminent

4    domain can not be paid for a use that is only possible based on a permit revocable at will.  United

5    States v. Fuller, 409 U.S. 488, 493-94 (1973).

6

7    **4. Scenario 3**

8           Under Scenario 3, Gimmy speculates that Campion would have pursued development

9    more aggressively had he not heard rumors in 1999 or 2000 that a transmission line might be

10   built over Agua Fria.  Assuming that permits, zoning changes, and other necessities would have

11   been procured, Gimmy asserts the value of Agua Fria would have increased an additional

12   $12,495,000 by 2003.  Doc. 98, Ex. E.  That is, Gimmy would value the 805 acres at $36,750/acre

13   instead of $21,000/acre.  Gimmy states "By 2000, Agua Fria was at a point where the remaining

14   entitlements for approval and development could have been obtained by the date of taking." Doc.

15   61, Gimmy Report, at 29.

16          Factually, Gimmy's optimistic outlook on development is not supported by the record.

17   While he details the numerous permit and approval steps taken prior to the rumors in 1999 or

18   2000, Gimmy does not provide a timeline to show how all of the further required permits and

19   approvals could have been procured in time.  In fact, he doesn't even provide a list of  what

20   would have been necessary for development at that point. See Doc. 61, Gimmy Report, at 26-31.

21   He does not say what facts cause him to believe development could have gone forward had

22   Campion pursued the necessary approvals more aggressively.  His assumption that Gimmy's

23   efforts were affected in 1999 or 2000 is unsupported.  In fact, Campion argues that he "pursued

24   further approvals until sometime in 2001, when it was clear that the power line project was to be

25   located through the center of his planned development." Doc. 105, Campion's Opposition, at 5:7-

26   8.  Again, the Merced County Assistant Planning Director wrote in 1995 that expansion of the

27   Villages to include Agua Fria (in order allow development on that property) would not occur

28   "until significant amounts of development had occurred and adequate infrastructure has been

1  installed" in the Villages proper. Doc. 121, September 15, 1995 Letter, at 3.  Assuming that

2  Campion would have been ready to break ground within three years (or two years depending

3  upon the version of facts) is unwarranted given the fact that the approval process for the Villages

4  itself is still moribund.  There is no evidence that development on Agua Fria would leapfrog over

5  development of the Villages.  Gimmy has not provided a factual basis for his opinion.

6       Campion cites to U.S. Supreme Court precedent to support his legal claim.  "[I]t would

7  be manifestly unjust to permit a public authority to depreciate property values by a threat of the

8  construction of a government project and then to take advantage of this depression in the price

9  which it must pay for the property," such is not the case here. United States v. Virginia Electric &

10  Power Co., 365 U.S. 624, 636 (1961), citations omitted.  Nevertheless, Campion must

11  demonstrate that the Government fully intended to complete the transmission line over Agua Fria

12  before it can begin calculating damages due to depreciation.  "The court must exclude any

13  depreciation in value caused by the prospective taking once the Government 'was committed' to

14  the project." United States v. Virginia Electric & Power Co., 365 U.S. 624, 636 (1961) (citing

15  United States v. Miller, 317 U.S. 369, 376-77 (1943).  Gimmy's testimony revalues Agua Fria

16  based on a vague counterfactual history starting in 1999 or 2000, when Campion allegedly heard

17  rumors of a possible transmission line.  Campion provides no evidence whatsoever that the

18  Government "was committed" to the project at that date.

19       Even assuming damages are permitted when a government taking is possible as opposed

20  to certain, this is not such a case.  According to Gimmy, Campion affirmatively failed to continue

21  the quest to procure the necessary permits.  The prospect of taking did not directly cause

22  diminution in value; Campion's actions did. In Virginia Electric, the question involved the

23  apportionment of a monetary eminent domain award between a flowage easement holder and the

24  holder of the subservient land. United States v. Virginia Electric & Power Co., 365 U.S. 624, 625

25  (1961).  As the government was building a dam to flood the land, the lower court awarded the

26  full amount of the payment to the easement holder as complete flooding, ruining all value to the

27  underlying subservient land, was certain.  The U.S. Supreme Court found that the lower court

28  must have instead apportioned by considering the probability of complete flooding before

34

1    eminent domain was instituted.  The "depreciation in value" was fully due to government action

2    in <u>Virginia Electric</u>; neither easement holder or subservient land holder took any action to change

3    the value of the land in that case.  In this case, any loss can not be said to be depreciation in

4    value.  Campion decided not to take action due to rumors he heard of a prospective taking.  By

5    not investing his time in further development attempts, he may have lost potential profits.

6    Though not a legal expert, Gimmy himself characterizes the damages as "loss of use or loss of

7    profits." Doc. 61, Gimmy Report, at 29.  At deposition, Gimmy admitted that the measure of

8    Scenario 3 should have included development costs. Doc. 112, Gimmy Deposition, at 142:5-10.

9    The basis of the analysis appears to be more akin to a land residual process; at this stage of

10   development, that is a measure of loss profits from a land development business rather than a

11   market valuation for Agua Fria as a whole.   "Since market value does not fluctuate with the

12   requirements or equities of the condemnor or condemnee, but is governed by what is the general

13   demand for the property on the open market, evidence of loss of profits, damage to good will, the

14   expense of relocation and other such consequential losses are not to be considered." <u>United</u>

15   <u>States v. 87.30 Acres of Land</u>, 430 F.2d 1130, 1132 (9th Cir. 1970).  Scenario 3 and its theory of

16   valuation is excluded.

17

18   **C. Watson Testimony**

19       Campion offers Watson's testimony to examine the probability of developing the

20   property. Doc. 105, Campion's Opposition, at 14:25-27.  The Government points out that

21   Watson "admits to having no expertise with respect to the issue of water rights, electromagnetic

22   fields, nor the impact they have on the housing market." Doc. 85, Government's Brief, at 24:8-

23   10.  In addition, the Government contends Watson lacks a "factual basis for his expert opinion."

24   Doc. 112, Government's Reply, at 12:19-22.  "Expert opinion testimony acquires special

25   significance in an eminent domain proceeding where the sole issue is the value of condemned

26   property." <u>United States v. 68.94 Acres of Land</u>, 918 F.2d 389, 393 (3rd Cir. 1990).

27       In making his report, Watson conducted "reconnaissance of the property; reconnaissance

28   of the surrounding areas; review of maps, plans, aerial photography, ground photographs, Merced

1    County planning documents; San Luis Water District documents; interviews with County

2    officials and others; and review of development properties in western Merced County and

3    western Stanislaus County." Doc. 61, Watson Report, at 7.  Campion argues that Watson is

4    "schooled in planning, has taught courses in planning, worked as a planning consultant, was

5    involved establishing the new town of Mission Viejo and served as Director of Advance

6    Planning for the new town of Aliso Viejo." Doc.105, Campion's Opposition, at 15:2-5.

7    Watson's report contains a statement of qualifications that shows he has been involved with

8    several city planning projects. See Doc. 61, Watson Declaration, Attachment 10.

9

10   **D. Campion's Development Plans**

11        The Government has made a motion to "exclude evidence of the landowner's plans or

12   goals." Doc. 87, Government's Brief, at 2:7-8.  Campion seeks to submit evidence of his

13   development plan, complete with proposed subdivision maps, to the jury under the theory that it

14   "illustrates how Campion land is sui[t]able and adaptable to residential development." Doc. 99,

15   Campion's Opposition, at 6:7-8.  More specifically, the plan "shows the physical adaptability of

16   the ranch for residential development, addressing where development fits within the topography

17   and avoiding pre-existing electrical transmission lines and environmental constraints. Second,

18   because it was intended for land use processing, it is based on County planning standards and is

19   part of the evidence of the reasonable probability of approval for residential development of the

20   land." Doc. 99, Campion's Opposition, at 1:27-2:4.  As discussed in this order, the adaptability

21   of Agua Fria to residential subdivision use is ultimately a question for the jury.  As this evidence

22   is offered by Campion to illustrate how development is feasible, it appears to be relevant.  Before

23   the development plan is to be introduced at trial, Campion must make an offer of proof to

24   establish their admissibility.

25        As a related issue, the Government argues that "a residential subdivision if otherwise

26   permissible, could be developed anywhere on the 3,200-acre ranch." Doc. 109, Government's

27   Reply, at 6:23-24.  At oral argument on October 17, 2005, the Government hinted that this was a

28   factual decision to be made by the court.  The issue was not discussed in the moving brief but

36

was only brought up in the reply brief.  At this late stage of the proceedings and without the benefit of explicit briefing, the issue can not be decided by the court; it must be for the jury to decide.  Campion has the burden of showing why the housing may not be built anywhere else on Agua Fria.  His development plans may be relevant to the issue if he can make a sufficient offer of proof.  In dealing with a taking of wooded land that supported a lumber mill, the Federal Claims Court found that since the landowner "has the burden of proving that the value of the remaining property was depreciated because of the partial taking," he/she has "the burden to show  persuasively that under existing circumstances it would be economically unfeasible to obtain available replacement timber." <u>Georgia-Pacific Corp. v. United States</u>, 640 F.2d 328, 359-60 (Ct. Cl. 1980).

## V. Conclusion

1. The Government's motion for partial summary adjudication, or in the alternative, motion in limine to exclude evidence of residential subdivision as highest and best use is DENIED.

2. The Government's motion in limine to exclude the testimony of Arthur E. Gimmy is GRANTED in part and DENIED in part.  Gimmy may testify as to the content of Scenario 1 of his Rule 26 report.  His testimony regarding Scenarios 2 and 3 are excluded.

3. The Government's motion in limine to exclude the testimony of Richard A. Watson is DENIED.

4. The Government's motion in limine to exclude evidence of Campion's development plan is tentatively DENIED.  As outlined above, Campion must make an offer of proof before the development plan may be admitted into evidence.

IT IS SO ORDERED.

**Dated:    October 25, 2005**            **/s/ Anthony W. Ishii**
0m8i78                                    UNITED STATES DISTRICT JUDGE